## LITTLETON AND CLAY v. J. D. GIDDINGS.

1. TRESPASS TO TRY TITLE.—In a suit brought by B against C for a tract of land conveyed to B by the heirs of J F, whose husband after her death had conveyed the same land, which was community property, to C, the court was asked to instruct the jury as follows: "If the jury believe from the evidence that the heirs of J F received the benefit of the consideration paid by C to their father for the land to raise means for the support of his children, (the said heirs,) then the sale from the father conferred a good title to the whole of said land, subject only to the rights of those who may have subsequently bought from the father without notice of C's claim,"—this instruction was refused : *Held*—

   1. Without deciding that there might not be such an equitable case made as would, under peculiar circumstances, justify such a rule, the instruction asked did not contain the correct rule of law by which to determine the rights of heirs to the mother's estate left in the hands of their father.

   2. Such a rule would place the father in the position of a guardian without the control of the courts in the disposition of an estate belonging to the heirs.

2. NOTICE—DEED.—A duplicate original deed, executed according to the forms of the civil law, before a colony empresario, and deposited in his office, was not notice of the sale to subsequent purchasers.

3. NOTICE.—Notice of an unrecorded deed to one interested with a subsequent purchaser in the purchase, but whose name does not appear in the subsequent conveyance, is notice to the subsequent purchaser to whom the conveyance is made.

4. REASONABLE DILIGENCE.—A purchaser of land, who before the purchase had notice of facts which should have put a prudent man on inquiry to ascertain if a former conveyance had been made by his vendor, does not meet the requirement that he shall prosecute with reasonable diligence an inquiry to learn the truth, by merely examining the record of conveyances in the county where the land is situated, and inquiring of the vendor himself, when an inquiry among the vendor's neighbors would reveal the former conveyance. If an inspection of the record should constitute sufficient inquiry, no other notice than the record of the deed would be available. If inquiry of the vendor himself would be sufficient, his denial of the former conveyance would rarely be wanting.

APPEAL from Washington. Tried below before the Hon. I. B. McFarland.

This suit was brought in trespass to try title, by J. D. Giddings against one Littleton, for a league of land in Burleson county, on the 23d February, 1857, Littleton being a tenant of the appellant, Tacitus Clay. The latter, under the authority of the statute, (Paschal's Dig., 5296,) averred his ownership and defended the suit; Clay pleaded general denial and not guilty. Giddings claimed by deed from James Fisher, dated in 1848, and by deed from the heirs of Jane Fisher, of subsequent date, all of which were of record. Clay claimed under two deeds from James Fisher to Walter Sutherland, the first dated the 7th December, 1825, for one fourth of the league, and the other the 17th April, 1827, for the remaining three fourths, neither of which appear to have been recorded in the proper county. The league was the community property of James Fisher and his wife, Jane Fisher. The evidence of Horatio Chrissman fixed the period of Jane Fisher's death as the fall or winter of 1825. Clay was in possession at the time of the institution of the suit.

The chief controversy was over the question of notice to Giddings, and those interested with him, of the former conveyance to Sutherland. The facts in evidence, so far as necessary to an understanding of the opinion, are stated in it.

*A. M. Jackson*, for appellant.

I. I admit to the fullest extent that a verdict must be clearly wrong, or an appellate court will not disturb it on a question of fact. "But," says this court, in Willis *v.* Lewis, 28 Tex., 191, "it is equally well established that when the verdict is clearly wrong—where the jury have found manifestly against the whole weight of the evidence—it is not only the right but the duty of the court to set it aside."

And it is to be observed, that the present case comes before this court precisely as it went to the jury. Not a witness testified before the jury. The whole of the evidence was documentary or by depositions. The jury, therefore, had no better opportunity than this court has, to scrutinize the proof

in the cause; and hence the principal reason for reluctance in disturbing their verdict does not exist in this case.

II. Is Giddings, the plaintiff, an innocent purchaser for a valuable consideration, without notice of the prior conveyances under which the defendants hold the land? How does it comport with that favored character, for the party who personates it to engage deliberately and avowedly in purchasing, from parties out of possession, a title which he himself represents to be doubtful, and which, on his own representations of its doubtful and litigious nature, he acquires as a speculation, and for a price admitted by himself to have been far less than the fair value of a good title? Such, according to the plaintiff's own witnesses, was his purchase from Jane Fisher's heirs.

[An exhaustive discussion by the counsel of the testimony is omitted.]

If appellee did not, as the record shows, make natural, and, under the circumstances, necessary inquiries, why did he not? Most obviously because he was afraid he would get such certain and circumstantial information of Fisher's sales to Sutherland as would spoil his speculation beyond all hope.

In Brush *v.* Ware, 15 Peters, 112, the Supreme Court of the United States says, "whatever shall put a prudent man on inquiry is sufficient. * * * * The law requires reasonable diligence in a purchaser to ascertain any defect of title. But when such defect is brought to his knowledge, no inconvenience will excuse him from the utmost scrutiny. He is a voluntary purchaser; and having notice of a fact which casts doubt upon the validity of his title, are the rights of innocent persons to be prejudiced through his negligence?"

The doctrine laid down in Guilbeau *v.* Mays, 15 Tex., 416; Wilson *v.* Williams, 25 Tex., 63, 64, and in some hundreds of other cases, fully sustains the positions I have assumed, and I submit with confidence that the judgment below is erroneous.

*N. G. Shelley*, also for appellant.

*Sayles & Bassett*, for appellee, on the question as to whether the deposit of a conveyance by public act, in the office of the empresario of the colony, was sufficient notice to subsequent purchasers, cited Watson v. Chalk, 11 Tex., 89; Guilbeau v. Mays, 15 Tex., 413; and Hawley v. Ballock, 29 Tex., 216.

The rest of their argument was devoted to a discussion of the facts bearing upon the question of notice to appellee of the former sale, of which extracts would convey no idea, and which is too lengthy for insertion.

*Hancock, West & North*, also for appellee.—Had the appellee seen a copy of the deed itself on record, but defectively recorded, it would not have been notice; for it is held to be the law that a deed defectively recorded is not notice—actual or constructive—although it be proved that the purchaser actually saw the record. (Kerns v. Swope, 2 Watts, 78, Opinion of Gibson; Butler v. Stevens, 26 Me., 484.) In White & Tudor's Leading Cases in Eq., (Johnson's ed., 1852,) in the second volume, top page 111, (part 1,) and in the American Notes to Le Neve v. Le Neve, the doctrine as to statements and rumors, such as are detailed in the case at bar, being notice, is fully considered, and the American authorities collected, by Messrs. Hare & Wallace; and the conclusion arrived at is, that statements of an adverse title, made at the time of a purchase, may or may not be notice, according to whether such statements are sufficiently clear and authentic to put the purchaser upon inquiry, and to enable him to conduct that inquiry to a successful termination.

ROBERTS, CHIEF JUSTICE.—It is contended by counsel for appellant, that it was incumbent upon the appellee Giddings to have shown that the consideration paid by Sutherland to James Fisher for the league of land after the death of his wife, Jane Fisher, was not by Fisher appropriated to the

payment of the community debts contracted during the marriage, upon the principle that the children of Jane Fisher, as her heirs, were entitled only to one half of the community estate which might be left after the settlement of all debts and claims against it by the surviving husband. (Jones *v.* Jones, 15 Tex., 147; Stramler *v.* Coe, 15 Tex., 216; Primm *v.* Barton, 18 Tex., 226; Good *v.* Combs, 28 Tex., 34.) There was no charge asked upon this point, nor does it seem to have been made in the court below. Indeed, the evidence tended to the conclusion that it could not have availed the appellee if it had been made, as it was proved that the land was paid for by Sutherland with a stock of horses, and there was no evidence showing debts against the community, or making it probable that there were debts of any magnitude. Nor was there evidence showing that the heirs of Jane Fisher had received anything from their father's estate to compensate them for their share of the community property to which they were entitled from their mother's part of the community estate. (Monroe *v.* Leigh, 15 Tex., 519.)

The appellant's counsel asked the court to charge, that "if the jury believe from the evidence that the heirs of Jane Fisher received the benefit of the consideration paid by Sutherland to their father, James Fisher, for the land, to raise means for the support of his children, the said heirs, then the sale from Fisher to Sutherland conferred a good title to the whole of said land, subject only to the rights of those who may have subsequently bought from Fisher, without any notice of the Sutherland claim." This charge was properly refused, there being no evidence calling for it; and further, without deciding that there might not be such an equitable case made as would, under peculiar circumstances, justify the application of such a rule, it would certainly not generally be a correct rule of law, determining the rights of heirs to the mother's interest in the community left in the hands of the father. It would put him in the position of a guardian, without the control of the court, in the disposition

of their effects, for which we know of no authority, by statute or otherwise, in this State.

It is contended by appellant's counsel, that appellee had constructive notice of Sutherland's deeds, under the registration laws. The conveyances were made in 1825 and 1827, before Stephen F. Austin, as empresario and judge of the new colony, in the ordinary form; and the duplicate originals were said, though not proved, to have been in the office at San Felipe de Austin, and being there, it did not require any further registration to give notice. This is decided to the contrary in the case of Watson *v.* Chalk, 11 Tex., 93, which is understood to have permanently established the rule on that subject.

The important questions in the case, as now presented in the record, are: Did the purchasers, under the subsequent deed of James Fisher to French and Giddings, at or before the time of their purchase, have notice of the unregistered deeds to Sutherland, previously made by James Fisher to the same land, and were the charges of the court and the refusal of charges asked on that subject erroneous?

The deed, with warranty, was executed in 1848, by James Fisher, for the league of land to Richard J. French and J. D. Giddings. It is certified to be a recorded deed in 1870, but the date of its having been recorded is not stated in the certificate. Its record was seen by one of the witnesses in 1851 or 1852.

Nunn states, that he was equally concerned with French in the purchase of the land, though his name was left out of the deed, and in this he is not contradicted by any witness: and he also states, that, before the purchase, he was informed that James Fisher had made a previous sale of the land to Sutherland.

French testified, that Asa M. Lewis was concerned with himself and Giddings in the purchase of the land.

John Fisher, a son of James, stated, that he knew that his father had sold the land to Sutherland, and got some Spanish

horses for it, and stated, that before his father sold to French and Giddings, he told Asa M. Lewis all he knew about the case, and employed him to sue for his interest in the land.

French testified, that he had heard, previous to their purchase of the land, that Sutherland's heirs claimed the league of land, which caused him to have the records examined.

Hensley, a witness for Giddings, stated, that the sale of the land from Fisher to Sutherland was notoriously known in the neighborhood where they lived, and that any one making inquiries about the land would have been likely to ascertain that it had already been sold by Fisher.

Mary E. Coles testified in a way to indicate that she was well acquainted with the Fisher family, though it is not stated where she lived at the time of the sale. She stated that the deed from Fisher to Sutherland was written in her house. Her depositions were taken in Washington county.

N. A. Clampitt's depositions were also taken in the same county, and he seems to have been well acquainted with Sutherland's and Fisher's families. He stated that it was currently spoken of in the neighborhood that Walter Sutherland did buy James Fisher's headright league of land in Burleson county, and that the sale was notoriously known in the neighborhood.

French stated, that not finding any deed from Fisher, transferring the land recorded, in Washington and Burleson counties, he asked James Fisher about the sale, and he denied that he had ever conveyed it by deed to any one, but admitted that there had been a trade with Sutherland for the land, which had been rescinded. He stated also, that he communicated all of the facts he had learned to Giddings, and upon examination of the records, and finding no transfer, they concluded that the title would be good.

Nunn stated, that he communicated to French, before their purchase in 1848, the information which he had obtained about James Fisher having sold the land previously to Sutherland. This is attempted to be shown to be incor-

rect, by the statement of Hensley, who says that at the time of the purchase Nunn was not present, being then absent on a cow-drive. But this cannot weaken the testimony of French, who states that he had heard that Sutherland's heirs claimed the land before the purchase.

This evidence, taken together, establishes that French and Giddings, as well as Lewis and Nunn, had such information of the claim of Sutherland's heirs as was well calculated to, and actually did, put them upon inquiry to ascertain whether James Fisher had not sold the land previously to Sutherland; and that if they had made that inquiry in the neighborhood where James Fisher had lived, which was near the land, they would readily have ascertained the fact that James Fisher had conveyed the land to Sutherland, and had received a valuable consideration for the same; and they could also have obtained information as to where the Sutherland heirs could be found.

Under the state of things as they existed in this country up to 1848, it was generally not difficult to trace out the history of a transaction of the importance of this one, by information derived from the old settlers, who, it is well known, knew each other at a great distance, and kept themselves informed usually about each other's transactions relating to their headrights. This is evidenced in this case by the familiarity and certainty with which witnesses speak of transactions that took place from twenty-five to forty years previous to their giving their evidence, some of whom lived at a distance which, at this day, would preclude all probability of their knowing anything about them.

The court charged the jury, that "the question of notice is a question of fact, to be determined by the jury from all the facts and circumstances given in evidence before them, and on this subject you are charged, that any information which will be sufficient to put a prudent man upon inquiry, will be regarded as notice, if it is of such a character that he might have ascertained the facts by the use of proper dili-

gence. Whether such notice was brought home to the plaintiff, and whether, if it was, he afterwards used the proper diligence to ascertain the facts in the case, are questions of fact for the jury to determine from the evidence."

It might seem difficult to understand how the jury could find a verdict for the plaintiff Giddings under such a charge, with this evidence before them. It may be in some measure owing to the fact that, on the trial, pains were taken to leave it in doubt that J. D. Giddings himself had any notice of the transfer of James Fisher to Sutherland; and although the court told the jury that notice to French would be notice to Giddings, still the court refused to give the same charge, as to notice, to Nunn, if they believed that he was also concerned with them as a partner in the purchase of the land; and in connection with the charge above quoted, and immediately following it, the jury were instructed, that "if you should believe from the evidence that the plaintiff [who was J. D. Giddings] had no notice of the Sutherland title, at the time he bought from James Fisher in 1848, then he is entitled to a verdict for the whole of the land in controversy." If the jury understood this as requiring that Giddings must have had personal knowledge of the title, or even information, such as French said he (French) had, it was calculated to mislead the jury; for if his co-purchaser, French, had sufficient notice, it was immaterial whether it was communicated to Giddings or not. And if Nunn or Lewis were equally with them concerned in the purchase, it is not perceived why notice to them would not equally be notice to Giddings, although their names were not inserted in the deed of purchase. That Nunn's means went in part to pay for the land in making the purchase, as mercantile partner of French, is not controverted; and French testified that A. M. Lewis was jointly concerned with him and Giddings in the purchase of the land in 1848 from James Fisher. If the absence of notice personally to J. D. Giddings had been a material fact, and it had been true that there had been an absence of it, it

is reasonable to suppose that his own testimony would have been offered to establish it. All of the parties, then, who were concerned in this purchase having had such information of a previous sale of the land, and that it was claimed by ·Sutherland's heirs, as was calculated to, and did in fact put them upon inquiry to find out the truth of it, the inquiry instituted was, first, to examine the records of Washington and Burleson counties. If that was sufficient diligence, no other notice than a record of the deed would be available; and, second, they applied to James Fisher to know if he had previously conveyed away the land. It must have been known to them that a man who was proposing to sell land, if he was doing it in fraud of the heirs of his vendee, could easily manufacture a tale of falsehood, and would do it. If it would be sufficient diligence to rely upon his mere word of denial, and stop further inquiry on that account, it would not likely be wanting in any case. Fisher did not furnish any facts calculated to mislead the parties, as to the sale to Sutherland, but rather to increase suspicion that there had been a sale, by admitting that there had been a trade with Sutherland for the land, that had been rescinded, which the evidence shows must have readily been corrected by an inquiry of disinterested persons in the neighborhood. Although it was shown that there was, or had been, a farm on the land, known to many of the witnesses at a distance, it was not shown that he was in possession at the time of the sale, nor was any inquiry made at that time about the possession. The amount of the consideration given to James Fisher, though an important matter in support of good faith in the purchase, is not definitely proved. Nunn states that he and his children each received $52, principally in goods from his and French's store. This, if true, would appropriately correspond with the consideration given for the purchase of chance for the title to a valuable league of land on the Brazos river.

The principle upon which an unregistered elder deed to land must yield its priority to a junior deed that has been

first recorded is, that the neglect to record the first deed has enabled the deceitful vendor to impose on one who has given a fair consideration for the land, under such circumstances as would reasonably justify an ordinarily prudent man in believing that he was getting a good, valid title to the land, in making the purchase. (Watson *v.* Chalk, 11 Tex., 93, 94.) The elder deed must hold the land until the one holding the junior title shall, under a proper charge of the court, show himself to occupy such a position. This the appellee has failed to do in this case, as it is presented in the record, in relation to the interest of James Fisher in the league of land in controversy. T. Clay, being in possession of the land, and being defendant, claiming to hold under the elder title, purchased from the heirs of Sutherland in 1856 and subsequently, is not a trespasser, although appellee may have the better title to one half of the land, in right of the children and heirs of Jane Fisher, which is not now necessary to be decided definitely, as there may be a change of facts upon another trial.

Because the court erred in not setting aside the verdict and granting a new trial, the judgment is reversed and the cause remanded.

REVERSED AND REMANDED.

[Associate Justice MOORE did not sit in this case.]